UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 05-894(DSD/SRN)


Dennis P. Hruby and
Sandra R. Hruby,

　　　　　Plaintiffs,

v.                                                    **ORDER**

Steven E. Larsen, Daniel J.
Larsen, Common Sense Mortgage,
Inc., Northern Title Insurance Co.,

　　　　　Defendants.


　　　Curtis D. Smith, Esq., J. Vincent Stevens, Esq. and Moss
　　　& Barnett, 4800 Wells Fargo Center, 90 South Seventh
　　　Street, Minneapolis, MN 55402, counsel for plaintiffs.

　　　Christopher D. Johnson, Esq., Erin K. Turner, Esq. and
　　　Johnson Law Firm, P.A., 56 East Broadway Avenue, Suite
　　　206, Forest Lake, MN 55025, counsel for Steven and Daniel
　　　Larsen.

　　　Craig A. Pearson, Esq, 3300 Bass Lake Road, Suite 120,
　　　Brooklyn Center, MN 55429, counsel for defendant Common
　　　Sense Mortgage.

　　　Katherine M. Bergenthal, Esq., Steven R. Little, Esq. and
　　　Coleman, Hull & van Vliet, 8500 Normandale Lake
　　　Boulevard, Suite 2110, Minneapolis, MN 55437, counsel for
　　　defendant Northern Title Insurance Co.



This matter came on for hearing on June 16, 2005, upon

plaintiffs' motion for a temporary restraining order.  Plaintiffs
and three of four defendants appeared through counsel.[1]  Based upon
a review of the file, record and proceedings herein, and the
arguments of counsel at the hearing, plaintiffs' motion is granted.

## BACKGROUND

Plaintiffs Dennis and Sandra Hruby (the "Hrubys") purchased a
house on July 13, 1999, for $146,000.  The Hrubys gave three
mortgages on the house in the amounts of $43,680 to U.S. Bank,
$101,924 to Long Beach Mortgage Company and $50,000 to U.S. Bank.
In 2004, the house went into foreclosure.  In early April 2004, the
Hrubys sought advice from defendant Steven E. Larsen ("Steven"),
who was at that time employed by defendant Common Sense Mortgage,
Inc., to find out how they could avoid foreclosure.  Steven
explained that he and his brother, defendant Daniel J. Larsen
("Daniel"), would be willing to help.  The Hrubys and Daniel then
executed a purchase agreement whereby Daniel would buy the house
for $230,000.  (See Larsen Aff. Ex. A.)

On May 19, 2004, six days after the foreclosure sale, the
Hrubys attended a closing at the offices of defendant Northern
Title Insurance Company in Shoreview, Minnesota.  They signed a
Redemption Notice, a warranty deed that conveyed the property to

---

[1]   Defendant Common Sense Mortgage, Inc., communicated to the
court that it has no position on plaintiffs' motion and would not
appear at the hearing.

Daniel, a HUD-1 Settlement Statement, and other documents.  The HUD-1 indicates cash to seller in the amounts of $44,718.52, which the Hrubys received in the form of two checks in the amount of $14,718.52 and $30,000.  (See id. Exs. B, C.)  However, at some point the Hrubys signed the $30,000 check over to Daniel, which was not reflected in the HUD-1.  The Hrubys also paid $7,982.60 towards Daniel's settlement charges.

After the sale was completed, the Hrubys walked across the hall to Steven's office and entered into a contract for deed (the "Contract").  (See id. Ex. D.)  The Contract specifies that the Hrubys agreed to repurchase their house from Steven and Daniel for $230,000, with no money down.  The Hrubys would make monthly, interest-only payments of $1,916.66 for two years, whereupon a balloon payment of "the entire unpaid balance and all accrued interest shall be due and payable in full." (Id. ¶ 4.)  The Hrubys allege that the transactions were never fully explained to them. (See Compl. ¶ 20.)  In contrast, the Larsens contend that they carefully explained that the Hrubys could keep the $44,718.52 in checks instead of entering into the contract for deed.

It is undisputed that the Hrubys made monthly payments in June, July and August of 2004.  It is disputed whether the Hrubys submitted valid checks or otherwise attempted to make payments for September, October and November of 2004.  On November 5, 2004, defendants served a Notice of Cancellation of Contract for Deed

upon plaintiffs.  (See Larsen Aff. Ex. E.)  The Hrubys have continued to live at the property and have not made any payments since receiving the notice.

On May 9, 2005, the Hrubys brought this action, alleging violations of the Truth in Lending Act ("TILA"), Home Ownership and Equity Protection Act ("HOEPA") and the Minnesota Consumer Fraud Act.  On or about May 17, 2005, the Larsens served the Hrubys with an Eviction Summons and Complaint, the hearing for which is set for June 17, 2005.  The Hrubys now move for a temporary restraining order to stay the eviction proceedings.[2]

## DISCUSSION

The court considers four familiar factors in determining

---

[2] At plaintiffs' motion hearing on June 16, 2005, the court first learned that the eviction hearing would take place the following day, on June 17, 2005.  Therefore, it ruled from the bench and denied plaintiffs' motion, holding that the Anti-Injunction Act prohibited the court from staying state court proceedings.  Neither party presented legal argument for or against the court's holding.  However, the court has since learned that this action requesting injunctive relief was filed before defendants began eviction proceedings against plaintiffs. Therefore, the Anti-Injunction Act is inapplicable.  See Nat'l City Lines, Inc. v. LLC Corp., 687 F.2d 1122, 1127-28 (8th Cir. 1982).

In denying plaintiffs' motion, the court also held that plaintiffs had adequate remedies at law, relying upon plaintiffs' statement that they seek full damages for the violations alleged. However, having had an opportunity to re-examine plaintiffs' complaint, the court notes that plaintiffs also seek rescission, declaratory and injunctive relief with the apparent aim of keeping or re-acquiring full ownership of their house.  Therefore, the court now finds that for purposes of this motion, plaintiffs do not have an adequate remedy at law.

4

whether a temporary restraining order should issue: (1) is there a substantial threat that the movant will suffer irreparable harm if relief is not granted, (2) does the irreparable harm to movant outweigh any potential harm that granting a preliminary injunction may cause the non-moving parties, (3) is there a substantial probability that the movant will prevail on the merits, and (4) what action is in the public interest. _Dataphase Sys., Inc. v. C.L. Sys., Inc._, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). The court balances the _Dataphase_ factors to determine whether the order is warranted. _See_ _Taylor Corp. v. Four Seasons Greetings, LLC_, 315 F.3d 1039, 1041 (8th Cir. 2003). Plaintiffs bear the burden to prove all four factors. _See_ _Watkins, Inc. v. Lewis_, 346 F.3d 841, 844 (8th Cir. 2003).

**A.   Irreparable Harm**

The first factor, irreparable harm, is perhaps the most important as "'[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.'" _Lewis_, 346 F.3d at 844 (quoting _Bandag, Inc. v. Jack's Tire & Oil, Inc._, 190 F.3d 924, 926 (8th Cir. 1999)). If denying an injunction results in eviction, then the irreparable harm element is likely met. _See_ _Higbee v. Starr_, 698 F.2d 945, 947 (8th Cir. 1983). In this case, the Hrubys have shown that the allegedly wrongful eviction proceedings brought by defendants will cause plaintiffs irreparable harm. The Hrubys have lived on the property

5

since 1999 and have three children.  If evicted, their lives would be substantially disrupted and their ability to find suitable, affordable housing is questionable.  Defendants allege that denying the restraining order will not automatically result in eviction. However, defendants have not disputed that, if the injunction does not issue, the Hrubys will likely be evicted in the very near future.  For all of above reasons, plaintiffs have established the first <u>Dataphase</u> factor.

Under the second factor, the court considers whether the irreparable harm to the movants outweighs any potential harm to the non-movants should the restraining order issue.  <u>See</u> <u>Dataphase</u>, 640 F.2d at 114.  Should the restraining order issue, the Larsens may be unable to receive rental or other income from the property until the matter is resolved.  However, the court finds that the balance of harms tips in favor of the Hrubys and the issuance of a restraining order.

The third factor questions whether the movant will likely prevail on the merits.  <u>See</u> <u>Dataphase</u>, 640 F.2d at 113.  The success of plaintiffs' federal law claims[3] depends upon whether defendants were "creditors" within the meaning of TILA and HOEPA. A "creditor" regularly extends credit and "is the person to whom the debt arising from the consumer credit transaction is initially

---

[3]  The court will focus only on plaintiffs' federal law claims because without them, the court lacks subject matter jurisdiction. <u>See</u> 28 U.S.C. § 1331.

6

payable." 15 U.S.C. § 1602(f). A person regularly extends credit if the person originates one or more credit extensions through a mortgage broker that are subject to section 226.32 of Title 12 of the Code of Federal Regulations. See 12 C.F.R. § 226.2(a)(17)(i) n.3. When a credit extension is subject to HOEPA and TILA, the creditor must make certain disclosures at certain times and cannot impose a balloon payment with a term of less than five years. See 15 U.S.C. § 1639(a), (b), (e); 12 C.F.R. § 226.32. Defendants have not disputed that (1) the contract for deed meets the annual percentage rate requirements of section 226.32 and (2) if the transactions at issue are subject to HOEPA and TILA, then they violate the disclosure and balloon payment provisions. (See Defs.' Mem. Law Opp'n Pls.' Mot. T.R.O. at 7.)

However, defendants allege that HOEPA and TILA are inapplicable because Daniel and Steven purchased and resold the property. In other words, defendants contend that they were not employed as mortgage brokers and did not conduct a credit transaction. In response, plaintiffs argue that the contract for deed should be construed as an equitable mortgage. "[W]hen the real nature of the transaction between the parties is that of a loan, advanced upon the security of realty granted to the party making the loan, it may be treated as an equitable mortgage." First Nat'l Bank of St. Paul v. Ramier, 311 N.W.2d 502, 503 (Minn. 1981). To impose such a construction, both parties must intend a

7

loan transaction with the deed as security and not as a sale. Ministers Life & Cas. Union v. Franklin Park Towers Corp., 239 N.W.2d 207, 210 (Minn. 1976).

The undisputed facts at this stage of the proceeding strongly suggest that the parties intended a loan transaction. First, the Hrubys came to the Larsens with the stated purpose of keeping their house and avoiding foreclosure. Second, although the Larsens maintain that they never intended to enter into a mortgage arrangement with the Hrubys, the purchase and reselling of the property occurred almost simultaneously and under conditions that indicate an expectation that Daniel's purchase would lead to the Hrubys' repurchase. Third, the Hrubys remained in the home and continued with their obligations of home ownership. Defendants argue that the executed documents failed to use terms such as "debt," "security" or "mortgage." However, the transfer of the $30,000 check to Daniel, without any corresponding credit to the Hrubys in the HUD-1 or the Contract, suggest that the documents involved did not accurately reflect or record the transactions. For all of these reasons, plaintiffs have shown a likelihood of success on their equitable mortgage allegation, and thus likely success on the merits of their HOEPA and TILA claims.

The fourth _Dataphase_ factor calls the court to consider the public interest.   _See_ 640 F.2d at 114.   Plaintiffs assert that public policy favors protecting the victims of equity stripping and preventing wrongful eviction.   Defendants respond that the public has an interest in holding people to the binding documents that they execute.   However, the court finds that the public interest weighs more in favor of protecting people who are threatened with eviction as a result of potentially unlawful transactions.   The court therefore determines that the Hrubys have established the fourth _Dataphase_ factor.   Considering that plaintiffs have met all four factors, the court finds that a temporary restraining order should issue.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that:

1.   Plaintiffs' motion for a temporary restraining order [Docket No. 3] is granted.

2.   Defendants Steven E. Larsen and Daniel J. Larsen, and all persons acting in concert or participation with them, are hereby temporarily enjoined from doing, causing, assisting, or directing any one of more of the following acts, practices and things until 12:00 p.m., June 30, 2005:

> From proceeding with pending eviction action
> C6-05-342, which is currently set for a
> hearing on Friday, June 17, 2005, in Minnesota
> State Court, Meeker County, or from commencing

9

any separate action in Meeker County Court, or otherwise, for purposes of seeking possession of the subject property, asserting any legal or equitable ownership in the property, or otherwise seeking to exclude the Hrubys from possession and/or legal or equitable title to the property, except for proceedings in the above-captioned action.

3.   Plaintiffs shall file with the Clerk of this Court an injunction bond in the amount of $1,000.

Dated:  June 17, 2005

s/David S. Doty
David S. Doty, Judge
United States District Court