UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 05-894(DSD/SRN)

Dennis P. Hruby and
Sandra R. Hruby,

       Plaintiffs,

v.                                       **ORDER**

Steven E. Larsen, Daniel J.
Larsen, Common Sense Mortgage,
Inc., Northern Title Insurance Co.,

       Defendants.

       Curtis D. Smith, Esq., J. Vincent Stevens, Esq. and Moss & Barnett, 4800 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402, counsel for plaintiffs.

       Christopher D. Johnson, Esq., Erin K. Turner, Esq. and Johnson Law Firm, P.A., 56 East Broadway Avenue, Suite 206, Forest Lake, MN 55025, counsel for Steven and Daniel Larsen.

This matter came on for hearing on June 28, 2005, upon plaintiffs' motion for a preliminary injunction. Plaintiffs and defendants Steven and Daniel Larsen appeared through counsel.[1] Based upon a review of the file, record and proceedings herein, and the arguments of counsel at the hearing, plaintiffs' motion is granted.

---

[1] Defendants Common Sense Mortgage, Inc., and Northern Title Insurance Company did not appear at the hearing.

**BACKGROUND**

Plaintiffs Dennis and Sandra Hruby (the "Hrubys") purchased a house on July 13, 1999, for $146,000. In 2004, the house went into foreclosure. In early April of 2004, the Hrubys went to Common Sense Mortgage, Inc. ("Common Sense"), for help. They were referred to defendant Steven E. Larsen ("Steven"), who was at that time employed by Common Sense. Steven explained that he and his brother, defendant Daniel J. Larsen ("Daniel"), would be willing to help. The Hrubys and Daniel executed a purchase agreement whereby Daniel would buy the house for $230,000. (See Larsen Aff. Ex. A.) On May 19, 2004, six days after the foreclosure sale, the Hrubys attended a closing at the offices of defendant Northern Title Insurance Company in Shoreview, Minnesota. They signed a Redemption Notice, a Warranty Deed that conveyed the property to Daniel, a HUD-1 Settlement Statement, and other documents. The HUD-1 indicates cash to seller in the amount of $44,718.52, which the Hrubys received in the form of two checks in the amounts of $14,718.52 and $30,000. (See id. Exs. B, C.) However, at some point the Hrubys signed the $30,000 check over to Steven, which was not reflected in the HUD-1. (See id. Ex. C.) The Hrubys also paid $7,982.60 towards Daniel's settlement charges.

After the sale was completed, the Hrubys walked across the hall to Steven's office and entered into a contract for deed (the "Contract"). (See id. Ex. D.) The Contract specifies that the

2

Hrubys agreed to repurchase their house from Steven and Daniel for $230,000, with no money down. The Hrubys would make monthly, interest-only payments of $1,916.66 for two years, whereupon a balloon payment of "the entire unpaid balance and all accrued interest shall be due and payable in full." (Id. ¶ 4.) The Hrubys allege that the transactions were never fully explained to them. (See Compl. ¶ 20.) In contrast, the Larsens contend that they carefully explained that the Hrubys could keep the $44,718.52 in checks instead of entering into the contract for deed.[2]

It is undisputed that the Hrubys made monthly payments in June, July and August of 2004. It is unclear whether the Hrubys submitted valid checks or otherwise attempted to make payments for September, October and November of 2004. On November 5, 2004, defendants served a Notice of Cancellation of Contract for Deed upon plaintiffs. (See Larsen Aff. Ex. E.) The Hrubys have continued to live at the property and have not made any payments since receiving the notice.

On May 9, 2005, the Hrubys brought this action, alleging violations of the Truth in Lending Act ("TILA"), Home Ownership and Equity Protection Act ("HOEPA") and the Minnesota Consumer Fraud Act. On or about May 17, 2005, the Larsens served the Hrubys with an Eviction Summons and Complaint, the hearing for which was set

---

[2] The court notes that the check for $30,000 that the Hrubys signed over to Steven was not reflected in the Contract for Deed.

for June 17, 2005. On May 23, 2005, the Hrubys moved for a temporary restraining order to stay the eviction proceedings, which this court granted on June 17, 2005. The Hrubys now move for a preliminary injunction to enjoin any eviction proceedings pending the outcome of this litigation. Defendants Steven and Daniel oppose the motion, primarily arguing that the court lacks subject matter jurisdiction and that the Anti-Injunction Act precludes the injunction sought by plaintiffs.

## DISCUSSION

**I.   Anti-Injunction Act**

Defendants argue that the Anti-Injunction Act precludes this court from granting plaintiffs' motion for preliminary injunction. The Anti-Injunction Act prohibits a federal court from enjoining state court proceedings "except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. The "necessary in aid of its jurisdiction" exception applies "when a federal court has first obtained jurisdiction of a matter in controversy by the institution of suit." Nat'l City Lines, Inc. v. LLC Corp., 687 F.2d 1122, 1127 (8th Cir. 1982). The "determinative

date" is that upon which a plaintiff seeks injunctive relief, whether by motion or by complaint.  See id. at 1124, 1128 n.9.

Here, it is undisputed that plaintiffs initiated their federal suit before defendants initiated eviction proceedings.  Further, plaintiffs requested in their complaint that the court enjoin defendants "from taking any action to cancel the Contract for Deed ... or imposing any further obligation on the Hrubys for payment under the contract," in addition to other requests for injunctive relief.  (Compl. ¶ 45(B)(1).)  Only after plaintiffs filed their complaint did defendants seek plaintiffs' eviction based upon the failure to make payments under the Contract for Deed.  Because plaintiffs sought relevant injunctive relief in their complaint, the court finds that it obtained jurisdiction over the matter in controversy before defendants sought eviction.  Therefore, the Anti-Injunction Act does not apply.[3]

## II.  Subject Matter Jurisdiction

Defendants argue that the court lacks subject matter jurisdiction because plaintiffs' federal claims are without merit.

---

[3]  Defendants argue that they did not have notice of the federal suit until after they began eviction proceedings. However, neither the Act nor any case law cited by defendants indicates that notice to a defendant is required to avoid the statutory bar. Defendants also assert that the mere filing of a federal complaint does not avoid the statutory bar, citing Baranick v. Investors Funding Corp., 489 F.2d 933, 936-37 (7th Cir. 1973). However, the plaintiffs in Baranick did not seek injunctive relief in their complaint.  See id. at 934.  Therefore, defendants' arguments are rejected.

See 28 U.S.C. § 1331. Likelihood of success on the merits is one of the factors the court must consider in deciding whether to issue a preliminary injunction. See Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc). Therefore, the court will address defendants' jurisdictional argument in that context.

The success of plaintiffs' federal law claims depends upon whether the parties conducted a "consumer credit transaction" in which the defendants were "creditors" within the meaning of TILA and HOEPA.[4] A mortgage is subject to TILA and HOEPA as "a consumer credit transaction that is secured by the consumer's principal dwelling." 15 U.S.C. § 1602(aa)(1). To determine whether a transaction was in fact secured by a dwelling, the court must look to Minnesota law.[5] See 12 C.F.R. § 226.2(a)(25) ("Security interest means an interest in property that secures performance of

---

[4] Defendants have not disputed that if TILA and HOEPA apply, then the transaction at issue would violate disclosure and balloon payment provisions. (See Defs.' Mem. Law Opp'n Pls.' Mot. Prelim. Inj. at 4-5.)

[5] Other courts have similarly looked to state law to decide whether TILA applies to a transaction. See James v. Ragin, 432 F. Supp. 887, 892 (W.D.N.C. 1977) (applying TILA to alleged conveyance with option to repurchase); see Redic v. Gary H. Watts Realty Co., 762 F.2d 1181, 1186-87 (4th Cir. 1985) (whether TILA applies to property sales with options to repurchase depends upon whether parties intended to execute loan with security interest); Long v. Storms, 622 P.2d 731, 738 (Or. Ct. App. 1981) (applying TILA pursuant to equitable mortgage principles); cf. Burnett v. Ala Moana Pawn Shop, 3 F.3d 1261, 1262 (9th Cir. 1993) (applying TILA because circumstances of "sale" showed transaction was in fact loan secured by property).

a consumer credit obligation and that is recognized by State or Federal law.").

The Minnesota Supreme Court has held that an alleged sale of property may be treated as a mortgage if "the real nature of the transaction between the parties is that of a loan, advanced upon the security of realty granted to the party making the loan." First Nat'l Bank of St. Paul v. Ramier, 311 N.W.2d 502, 503 (Minn. 1981). To impose such a construction, both parties must intend a loan transaction with the deed as security and not a sale. Ministers Life & Cas. Union v. Franklin Park Towers Corp., 239 N.W.2d 207, 210 (Minn. 1976). "Intention is to be ascertained by the written memorials of the transaction and the attendant facts and circumstances." Id. at 210.

The undisputed facts at this stage of the proceeding strongly suggest that the parties intended a loan transaction. The Hrubys came to Common Sense Mortgage and the Larsens with the stated purpose of keeping their house and avoiding foreclosure. Although the Larsens maintain that they never intended to enter into a mortgage arrangement with the Hrubys, the purchase and reselling of the property occurred almost simultaneously and under conditions that indicate an expectation that Daniel's purchase would lead to the Hrubys' repurchase. The Hrubys remained in possession of the home and continued with their obligations of home ownership. Defendants argue that the executed documents failed to use terms

7

such as "debt," "security" or "mortgage."  However, the transfer of the $30,000 check to Steven, without any corresponding credit to the Hrubys in the HUD-1 or the Contract, suggest that the documents involved did not accurately reflect or record the transactions.  For all of these reasons, plaintiffs will likely be successful in proving that their transaction with defendants was a mortgage subject to HOEPA and TILA.

Although plaintiffs can likely show that a "consumer credit transaction" occurred, federal law requires more to establish that defendants were creditors within the meaning of TILA and HOEPA.  A "creditor" regularly extends credit and "is the person to whom the debt arising from the consumer credit transaction is initially payable."  15 U.S.C. § 1602(f).  A person regularly extends credit if, in any twelve-month period, the person (1) originates two or more credit extensions subject to 12 C.F.R. § 226.32 or (2) originates one or more such credit extensions through a mortgage broker.  12 C.F.R. § 226.2(a)(17)(i) n.3.

If the transaction at issue is subject to TILA and HOEPA, it is undisputed that defendants are those "to whom the debt arising from the consumer credit transaction is initially payable."  15 U.S.C. § 1602(f).  It is further undisputed that the transaction would be a mortgage subject to § 226.32 of Title 12 of the Code of

Federal Regulations. Therefore, the inquiry turns on whether Steven or Daniel extended credit to the Hrubys through a mortgage broker.[6]

The facts presented thus far show that Daniel was a "creditor" in the transaction because he originated an extension of credit to the Hrubys through Steven, who acted as a broker. A mortgage broker is "[a]n individual or organization that markets mortgage loans and brings lenders and borrowers together." Black's Law Dictionary 206 (8th ed. 2004). The Hrubys were referred by Common Sense Mortgage to Steven. Steven then introduced the Hrubys, the borrowers, to his brother Daniel, the lender. (See Larsen Aff. Ex. B.) These facts show that Steven acted as intermediary and mortgage broker in the transaction. Indeed, the business card that Steven gave to the Hrubys indicated that he was a mortgage broker. Based on these facts, plaintiffs will likely succeed in showing that Daniel was a "creditor" under TILA and HOEPA.[7]

Because plaintiffs have shown a likelihood of success on their federal claims, they have a fortiori presented a federal question on the face of their well-pleaded complaint. See Beneficial Nat'l

---

[6] Plaintiffs have not alleged or shown that defendants originated in the same twelve-month period any other credit extension subject to 12 C.F.R. § 226.32, so they must show that their credit extension was through a mortgage broker. See 12 C.F.R. § 226.2(a)(17)(i) n.3.

[7] The court is unable to ascertain whether plaintiffs will be able to show that Steven is also a creditor.

Bank v. Anderson, 539 U.S. 1, 12 (2003) (complaint must invoke federal law as basis for relief). Defendants' subject matter jurisdiction argument must fail.

**III. Preliminary Injunction**

The court considers four familiar factors in determining whether a preliminary injunction should issue: (1) is there a substantial threat that the movant will suffer irreparable harm if relief is not granted, (2) does the irreparable harm to movant outweigh any potential harm that granting a preliminary injunction may cause the non-moving parties, (3) is there a substantial probability that the movant will prevail on the merits, and (4) what action is in the public interest. Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc). The court balances all four Dataphase factors to determine whether the order is warranted. See Taylor Corp. v. Four Seasons Greetings, LLC, 315 F.3d 1039, 1041 (8th Cir. 2003). Plaintiffs bear the burden to prove all four factors. See Watkins, Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003).

    **A.   Irreparable Harm**

The first factor, irreparable harm, is perhaps the most important as "'[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.'" Lewis, 346 F.3d at 844 (quoting Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924, 926 (8th Cir. 1999)). If denying

10

an injunction results in eviction, then the irreparable harm element is likely met. See Higbee v. Starr, 698 F.2d 945, 947 (8th Cir. 1983). In this case, the Hrubys have shown that the allegedly wrongful eviction proceedings brought by defendants will cause plaintiffs irreparable harm. The Hrubys have lived on the property since 1999 and have three children. If evicted, their lives would be substantially disrupted and their ability to find suitable, affordable housing is questionable.[8] For all of the above reasons, plaintiffs have established the first Dataphase factor.

**B.   Balance of Harms**

Under the second factor, the court considers whether the irreparable harm to the movants outweighs any potential harm to the non-movants should the injunction issue. See Dataphase, 640 F.2d at 114. Should the injunction issue, the Larsens may be unable to receive rental or other income from the property until the matter is resolved. However, as discussed above, the Hrubys risk losing their home and having their lives substantially disrupted. The court finds that the balance of harms tips in favor of the Hrubys and the issuance of an injunction.

---

[8] Defendants alleged in their memorandum in opposition to plaintiffs' motion for a temporary restraining order that denying an injunction will not automatically result in eviction. However, defendants have not disputed that, if the injunction does not issue, the Hrubys will likely be evicted in the very near future.

### C. Likelihood of Success on the Merits

The third factor questions whether the movant will likely prevail on the merits. See Dataphase, 640 F.2d at 113. The court analyzed this factor above and found that plaintiffs have met their burden to show a likelihood of success on the merits of their federal claims.

### D. Public Interest

The fourth Dataphase factor calls the court to consider the public interest. See 640 F.2d at 114. Plaintiffs assert that public policy favors protecting the victims of equity stripping and preventing wrongful eviction. Defendants respond that the public has an interest in holding people to the binding documents that they execute. Although the public interest does support the payment of debts, the court finds that it weighs more in favor of protecting people who are threatened with eviction as a result of potentially unlawful transactions. The court therefore determines that the Hrubys have established the fourth Dataphase factor. Considering that plaintiffs have met all four factors, the court finds that an injunction should issue.

## IV. Bond

Defendants request a bond in the amount of $5,000 in addition to monthly payments of $1,441.20 to cover the Larsens' monthly expenses for the home that plaintiffs continue to possess. Plaintiffs oppose any bond amount, but stated at oral arguments

12

that they are willing to pay defendants $166.66 per month towards homeowner's insurance and taxes due on the house. However, because the Hrubys are not otherwise obligated to pay for their residence, an appropriate security payment in this case should more closely resemble "rent" than what plaintiffs suggest. The court finds that a $1,000 bond and monthly payments of $500 to be paid to the Larsen defendants is adequate security as required by Federal Rule of Civil Procedure 65(c).

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' motion for a preliminary injunction [Docket No. 25] is granted.

2. Defendants Steven E. Larsen and Daniel J. Larsen, and all persons acting in concert or participation with them, are hereby enjoined from doing, causing, assisting, or directing any one of more of the following acts, practices and things:

> From proceeding with pending eviction action C6-05-342 in Meeker County, or from commencing any separate action in Meeker County Court, or otherwise, for purposes of seeking possession of the subject property, asserting any legal or equitable ownership in the property, or otherwise seeking to exclude the Hrubys from possession and/or legal or equitable title to the property, except for proceedings in the above-captioned action.

    3.    The $1,000 bond filed by plaintiffs with the Clerk of this Court on June 21, 2005, shall be continued. Plaintiffs shall also submit a payment of $500 to either Steven E. Larsen or Daniel J. Larsen on the first day of every month beginning July 1, 2005.

Dated:   June 30, 2005

                                            s/David S. Doty
                                            David S. Doty, Judge
                                            United States District Court